**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANGELA M. NAGLE,

                              Plaintiff,                      1:16-cv-00214 (BKS/ATB)

v.

EAST GREENBUSH CENTRAL SCHOOL DISTRICT;
BOARD OF EDUCATION OF EAST GREENBUSH
CENTRAL SCHOOL DISTRICT; and individually and in
their official capacity as members of the Board: SHAY
HARRISON; MARK MANN; KATHERINE MACIOL;
KAREN CURRAN; JOHN DUNN, JR.; MICHAEL
BUONO; JENNIFER MASSEY; JOANN TAYLOR;
KATHLEEN CURTIN; and SUSAN GARRIGAN-PIELA,

                              Defendants.

**APPEARANCES:**

*For Plaintiff:*
Ryan M. Finn
E. Stewart Jones Hacker Murphy, LLP
28 Second Street
Troy, NY 12180

*For Defendants:*
Eileen M. Haynes
Malcolm B. O'Hara
Bartlett, Pontiff, Stewart & Rhodes, P.C.
One Washington Street, P.O. Box 2168
Glens Falls, NY 12801

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

      Plaintiff Angela M. Nagle brings this action alleging: (1) gender discrimination and

retaliation in violation of Title VII of the Civil Rights Act of 1964 (as amended by the Pregnancy

Discrimination Act (the "PDA")), 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); (2) violation of

the Equal Protection Clause of the New York Constitution and the Fourteenth Amendment to the

United States Constitution; (3) violation of Title IX of the Education Amendments Act of 1972,

20 U.S.C. §§ 1681–1688 ("Title IX"); (4) violation of the Americans with Disabilities Act, 42

U.S.C. §§ 12101–12213 (the "ADA"); and (5) violation of the Family and Medical Leave Act,

29 U.S.C. §§ 2601–2654 (the "FMLA"). (Dkt. No. 1). Defendants East Greenbush Central

School District (the "District"), the District's Board of Education (the "Board"), and Board

members Shay Harrison, Mark Mann, Katherine Maciol, Karen Curran, John Dunn, Jr., Michael

Buono, Jennifer Massey, Joann Taylor, Kathleen Curtin, and Susan Garrigan-Piela moved for

summary judgment on May 1, 2017. (Dkt. No. 16). For the reasons discussed below, the motion

is granted in part and denied in part.

## II.    FACTS[1]

### A.    Plaintiff's Employment as Superintendent

Plaintiff was hired as the Superintendent of Schools for the East Greenbush Central

School District in July 2008. (Dkt. No. 16-83, ¶¶ 1, 10). Her employment agreement, which had

an initial term ending on June 30, 2011, was extended through several amendments, the last of

which was signed in 2012 and prolonged her contract until June 2016. (*Id.* ¶¶ 11, 12). The

contract would expire automatically unless the District's Board of Education notified Plaintiff no

later than one year prior to the end of the contract term (i.e., by June 1, 2015) that it intended to

renew; failure to provide such written notification of renewal constituted notice of nonrenewal

under the contract. (*Id.* ¶ 15). Plaintiff could also be terminated for cause, in which case she was

---

[1] Where possible, the facts have been drawn from Defendants' statement of material facts (Dkt. No. 16-83),
Plaintiff's response thereto (Dkt. No. 22), and the attached exhibits. However, as described herein, many of the facts
regarding Plaintiff's performance as a Superintendent are disputed.

entitled to notice of the charges and a hearing before an impartial hearing officer prior to termination. (*Id.* ¶ 16).

Under the contract, the Board had to "promptly and discreetly refer to the Superintendent, for her study and recommendation, any and all criticisms [and] complaints . . . regarding the administration of the District or the Superintendent's performance of her duties." (Dkt. No. 16-13, ¶ 3(C); Dkt. No. 16-83, ¶ 49). Further, the Board and the Superintendent were to meet periodically to discuss performance, working relationships, and communicative processes to address any concerns that may arise. (Dkt. No. 16-13, ¶ 5; Dkt. No. 16-83, ¶ 50). In practice, however, the Board brought to Plaintiff's attention any such criticism or complaints during her annual reviews.[2] (Dkt. No. 16-83, ¶ 51). The annual reviews were broken down by the Superintendent's annual goals—which changed from year to year—and then again by certain standards the Board wanted the Superintendent to meet. (*Id.* ¶ 38). The Board's 10 standards remained the same from year to year: (1) district leadership and culture; (2) policy and governance; (3a) board communication; (3b) community relations; (3c) staff/student communication; (4) organizational management; (5) curriculum planning; (6) instructional leadership; (7) human resource management; and (8) values and ethics of leadership. (*Id.* ¶ 39).

## B.    Initial Term (2008–2011)

In her first few years as a Superintendent, Plaintiff made improvements in academics, developing programs that benefited the District and raised the District's scores. (*Id.* ¶ 17). Some Board members, however, had concerns about her leadership style, felt that she often took an

---

[2] Plaintiff does not deny that fact, but she disputes whether such criticism was well-founded. (*See* Dkt. No. 22, ¶ 51; *see also infra* note 3).

aggressive tone toward staff, and felt that she did not communicate well with the Board.[3] (*Id.* ¶ 18). Plaintiff denies that she was aggressive toward any employee. (Dkt. No. 22, ¶ 26).

According to Defendant Harrison, Plaintiff's "aggressive tone toward staff," such as her comments about the performance of the administrative team, was "unprofessional and unproductive." (Dkt. No. 16-12, ¶ 6; *see also* Dkt. No. 16-83, ¶ 22). He provides the example of Assistant Superintendent of Curriculum Kitty Summers, who Plaintiff criticized in an October 2010 executive session of the Board, claiming Ms. Summers "was not doing a good job and should be let go." (Dkt. No. 16-12, ¶ 6). Defendants contend that the Board dismissed Ms. Summers based on incomplete information that Plaintiff provided. (*Id.* ¶ 19). Plaintiff responds that the Board "fully supported the actions taken against Kitty Summers at the time." (Dkt. 23-1, ¶ 95). Further, Defendants contend that Plaintiff "made questionable comments about teachers and members in the community, one of whom then joined the Board," had "a contentious relationship with some members of the District's administrative staff," and was "overly critical of these individuals to the Board." (Dkt. 16-83, ¶¶ 20, 28, 29). Plaintiff disputes these assertions. (Dkt. No. 22, ¶ 20).

According to Defendants, Plaintiff requested that Board members not speak to members of the community, administrative staff, or faculty (and vice versa) unless she was present—a request that some interpreted as an improper attempt to control the flow of information. (Dkt. No. 16-83, ¶¶ 23, 24). Plaintiff denies ever directing staff and board members to avoid communicating. (Dkt. No. 22, ¶¶ 23, 24). Defendants assert that Board members were concerned about Plaintiff's failure to communicate on various other issues. (Dkt. No. 16-83, ¶ 55).

---

[3] Plaintiff does not deny these facts, but she characterizes those Board members' concerns as "constructive criticism" and further adds that such criticism was "unfounded." (*See* Dkt. No. 22, ¶ 18). Plaintiff uses identical language in response to a dozen more paragraphs in Defendants' statement of material facts. (*See, e.g.*, *id.* ¶¶ 40–46, 51–52, 72–75). Given that Defendants' assertions regarding Board members' concerns are supported by the record and that Plaintiff does not specifically deny these assertions, the Court deems them undisputed. *See* L.R. 7.1(3).

In September 2010, Plaintiff told the Board that she was pregnant. (*Id.* ¶ 25). She delivered her baby in March 2011 and took approximately eight weeks of maternity leave. (*Id.*). At the time, five of the 10 individual Defendants—Board President Dr. Harrison, Ms. Taylor, Ms. Curran, Mr. Mann, and Ms. Maciol—were already on the Board. (*Id.* ¶ 14). Several additional Board members, including Defendant Curtin, were elected in spring 2011 and started their position in July 2011. (*Id.* ¶ 26).

According to Defendants, these new members "took a much less aggressive tone toward the staff and sought to work collaboratively with the teachers and administrators in the District," which caused Plaintiff to "moderate[] her tone about the staff in her reports to the Board." (*Id.*). Plaintiff rejects these characterizations. (Dkt. No. 22, ¶ 26).

### C.     2011–2012 School Year

In her annual review for the 2011-2012 school year,[4] some Board members commented that Plaintiff needed to work on her interactions with members of the administrative staff, members of the public, counterparts at Questar III Board of Cooperative School Districts ("BOCES")—an organization funded by school districts, of which the District was a member, enabling school districts to share instructional, administrative, and financial resources to promote economy and efficiency—teachers, and students; however, other Board members noted improvement in her leadership, communication, and tone. (Dkt. No. 16-83, ¶ 46; Dkt. No. 16-18, at 4–10). Some Board members also suggested that Plaintiff improve her instructional leadership, human resource management, and delegation of duties, although others expressed positive views. (Dkt. No. 16-83, ¶ 46; Dkt. No. 16-18, at 13–16).

---

[4] The evaluation is not dated. (*See* Dkt. No. 16-18).

At the end of the school year, in August 2012, Plaintiff approached the Board for a contract extension, which the Board approved. (Dkt. No. 16-83, ¶ 27). According to Defendants, the Board granted the extension because Plaintiff became more collaborative. (*Id.*).

### D.    2012–2013 School Year

Defendants contend that Plaintiff's "problems with personnel began again" during the 2012–2013 school year. (*Id.* ¶ 32). According to Defendants, "Plaintiff was overly critical of Michael Leonard, the Athletic Director," complaining about the way he dressed, his communication style, and typos in his written work. (*Id.* ¶ 21). Mr. Leonard felt Plaintiff "belittled him in meetings with other administrators" and "did not acknowledge his accomplishments and gave him unfair reviews." (*Id.* ¶ 32). Defendants maintain that, while Mr. Leonard and some other administrative staff spoke to Board members about their concerns, they did not bring a formal complaint against Plaintiff because of fear of retaliation. (*Id.* ¶¶ 30–32).

Plaintiff denies that "these individuals were mistreated or that an atmosphere of retribution was created." (Dkt. No. 22, ¶¶ 30–31). She asserts that she "did not have a contentious relationship" with these individuals, "did not demean, belittle nor . . . was overly critical of them," "did not isolate any of these individuals and was always cordial and polite to each of them." (Dkt. No. 23-1, ¶ 78). With regard to Mr. Leonard in particular, Plaintiff states that he was "supervised by Michele Bowman, Assistant Superintendent for Personnel and Professional Development," not by Plaintiff, and that he "received strong performance evaluations" from Ms. Bowman. (*Id.* ¶ 83). She does concede, however, that she "felt Mr. Leonard had some improvements to make" and attempted to "help him improve." (*Id.* ¶ 84). Plaintiff sought disciplinary charges against Mr. Leonard on the ground that he was "insubordinate"; Defendants contend these charges were unsupported. (Dkt. No. 16-83, ¶ 33).

Plaintiff responds that there were "numerous documented concerns" and that "the goal was to help Mr. Leonard succeed at the District, not to have him removed." (Dkt. No. 23-1, ¶ 86).

Defendants also claim that Plaintiff "informed the Board that she was having problems" with Ms. Bowman in December 2012, "at a time when Ms. Bowman was preparing to go on a medical leave for surgery on her foot." (Dkt. No. 16-83, ¶ 34). According to Defendants, Plaintiff "said that Ms. Bowman was becoming a disruptive force among the Administrative Staff," stated that her "work had been sloppy," and "blamed Ms. Bowman for the problems with the search" for a principal at Green Meadow. (*Id.*). Defendants contend that Board members "were concerned that [Plaintiff] had not voiced these concerns" before the extension of Ms. Bowman's contract, and that they asked Plaintiff to update the Board about Ms. Bowman's performance, which Plaintiff purportedly never did. (*Id.* ¶ 35). Plaintiff disputes these assertions, stating that Ms. Bowman had "some problems meeting deadlines" but improved after she spoke to her, that "the Board was notified that there was no longer an issue," and that Plaintiff "never claimed that [Ms. Bowman] was a disruptive force or that she was contentious." (Dkt. No. 23-1, ¶ 212).

Defendants bring up Plaintiff's purported problems with Marty Mahar, an assistant principal at Columbia High School. (Dkt. No. 16-83, ¶ 36). Per their account, Plaintiff "prevented Marty Mahar . . . from obtaining a Principal position at Green Meadow Elementary School" when she informed the Board that "Mr. Mahar had illegally added time to his tenure," and told Defendant Harrison that "Mr. Mahar was struggling with scheduling at the high school." (*Id.*). Plaintiff responds that the decision not to hire Mahar was taken by a committee and that the Board "unanimously agreed that he was not the best candidate." (Dkt. No. 23-1, ¶¶ 97–98). She also asserts that her concerns about Mr. Mahar were well-founded. (*Id.* ¶¶ 102–105).

Plaintiff's 2012–2013 annual review[5] indicated that Plaintiff was very strong academically in the areas of educational knowledge, establishment and implementation of educational policies, and curriculum development, and that she brought many good programs to the District. (Dkt. No. 16-83, ¶¶ 40, 41). Nonetheless, some Board members expressed concern about Plaintiff's ability to communicate effectively with the Board, adequately lead the District's staff and administrators, and accept constructive criticism. (*Id.*; Dkt. No. 16-17, at 12, 15–17, 19–20, 24–26). Some also expressed concerns that Plaintiff did not attend many community events. (Dkt. No. 16-83, ¶ 40; Dkt. No. 16-17, at 19). Plaintiff's overall score was 3.18 (down from 3.23 the year before), which indicated that she was meeting expectations, but she scored 2.68 in staff/student communications (down from 2.96) and 2.61 in human resource management (down from 3.17), which meant she was working toward meeting expectations in those areas. (Dkt. No. 16-83, ¶ 44; Dkt. No. 16-17, at 31).

### E.    2013–2014 School Year

Defendants assert that Plaintiff's "communications and personnel management issues continued" during the 2013–2014 school year. (Dkt. No. 16-83, ¶ 47). For example, according to Defendants, Plaintiff told the Board in January or February 2014 that Matt Sloan, the principal of Goff Middle School,[6] had performance issues, but she did not provide updates on his progress when the Board considered him for tenure a few months later. (*Id.* ¶¶ 47, 53, 54; Dkt. No. 16-12, ¶ 29). Plaintiff responds that she did not bring up any concerns about Mr. Sloan but simply

---

[5] Plaintiff and Defendant Harrison signed the evaluation on August 16, 2013. (*See* Dkt. No. 16-17, at 30).

[6] Defendants' statement of material facts, however, places Mr. Sloan at Bell Top Elementary School in 2013. (Dkt. No. 16-83, ¶ 53).

"stated that he was an average administrator" when she was asked to provide an opinion about him, and that the Board never asked for any additional information.[7] (Dkt. No. 23-1, ¶ 213).

In May 2014, Plaintiff, through her attorney, sought a three-year extension and some modifications to her contract. (Dkt. No. 16-83; ¶ 65; Dkt. No. 23-1, ¶ 44; Dkt. No. 23-7). In response, the Board's attorney wrote that he had discussed the request with Defendant Harrison, who had indicated that "the Board was not of a mind to address contract modification at this time" for "reasons not pertaining to [Plaintiff] in any fashion or to her performance." (Dkt. No. 23-7). The Board's attorney opined that "the Board was more of a mind to look at the contract and any changes (including the term of same) at a later date."[8] (Dkt. No. 23-7).

Another issue concerned the continuing tensions between the District and BOCES. (Dkt. No. 16-83, ¶¶ 57, 58). The District's relationship with BOCES deteriorated over the years, partly because the District objected to paying BOCES for certain post-retirement benefit plans

---

[7] Defendants contend that Plaintiff "reproached Board Members for intervening in District affairs"—which Plaintiff denies (Dkt. No. 16-83, ¶ 48; Dkt. No. 22, ¶ 48). To support that contention, Defendants cite a certain October 2013 email exchange between Plaintiff and Defendant Taylor, referred to as "Exhibit 7," which, according to Defendant Harrison, indicates that Plaintiff responded in a "curt and abrasive" manner to Defendant Taylor's attempt to facilitate a meeting between a parent and Mr. Sloan. (Dkt. No. 16-12, ¶ 30). The Court notes that no such "Exhibit 7" appears to have been filed, and that Defendant Taylor does not mention the incident in her affidavit. (See Dkt. No. 16-82). Accordingly, the Court will not consider Defendants' statements concerning that purported email. A similar issue is presented by "Exhibit 41" to Defendant Harrison's affidavit, purportedly a copy of the October 14, 2015 board minutes, (see Dkt. No. 16-12, ¶ 102), which does not appear to have been filed. Further complicating the Court's review of the record, Defendants skipped exhibit numbers, (see id. ¶¶ 43, 44 (skipping from "Exhibit 10" to "Exhibit 12")), mislabeled exhibits, (see id. ¶¶ 41, 43 (referring to two different documents as "Exhibit 9")), and filed exhibits in incorrect order, (compare Dkt. No. 16-31 (seemingly referring to "Exhibit 19" to Defendant Harrison's affidavit), with Dkt. No. 16-30 (seemingly referring to "Exhibit 20" to Defendant Harrison's affidavit); compare also Dkt. No. 16-85 (Defendant Maciol's deposition excerpts, referred to as "Exhibit 10" to Mr. Haynes' declaration), with Dkt. No. 16-11 (Defendant Curran's deposition excerpts, referred to as "Exhibit 11" to Mr. Haynes' declaration)). Finally, the Court notes that Defendants failed to file "Exhibit 1" to Benjamin Ferrara's affirmation, (see Dkt. No. 16-57, ¶ 9); it appears that this document refers to one of the mislabeled "Exhibit 9" to Defendant Harrison's affidavit. (See Dkt. No. 16-21). As for Plaintiff's filings, the Court notes that she mistakenly filed Defendant Harrison's deposition instead of her own deposition as Exhibit 3 to her declaration. (See Dkt. No. 23-3).

[8] Per Defendants, "[t]he Board felt that it was not the right time, since [Plaintiff] had 2 more years on her contract." (Dkt. No. 16-83, ¶ 65). Plaintiff confirms Defendant Harrison told her it was too early. (Dkt. No. 23-1, ¶ 46).

("OPEB") and because BOCES objected to the District's development of certain science,

technology, engineering, and math ("STEM") programs already offered by BOCES. (*Id.* ¶ 59).

According to Defendants, a "main component of the breakdown between BOCES and the

District . . . was the personality conflict between Plaintiff and BOCES Superintendent James

Baldwin," which led Plaintiff to skip BOCES meetings. (*Id.* ¶ 60). Defendant Harrison recounts

meeting with Dr. Baldwin in fall 2013 "to attempt to repair the relationship" between the District

and BOCES, but "Dr. Baldwin told [him] that Plaintiff was rude and belittling during BOCES

superintendent meetings." (*Id.* ¶ 62). Despite that meeting, "the tensions between BOCES and

the District continued," as "the District started to create the STEM programs." (*Id.*). Plaintiff, on

the other hand, states that Dr. Baldwin "bullied and harassed" her, and that Defendant Harrison

"supported [her] decision to miss some of the meetings." (Dkt. No. 23-1, ¶ 172). Plaintiff was

concerned that Dr. Baldwin would attempt to have her terminated. (Dkt. No. 16-83, ¶ 63).

Further, Plaintiff contends that, "at times, [BOCES'] relationship with [her] was actually quite

positive," (Dkt. No. 23-1, ¶ 163), and that Defendant Harrison "himself fueled the negative

relationship with BOCES by frequently engaging in unprofessional written tirades between

himself, Dr. Baldwin, and Andy DeFeo, Dr. Baldwin's Assistant Superintendent," (*id.* ¶ 164).

In 2014, Defendant Buono, BOCES' Human Resources Director, was elected to the

Board. (Dkt. No. 16-83, ¶ 64). In June 2014, Defendants Dunn and Curtin met with Dr. Baldwin

and Gladys Cruz of BOCES to attempt to mend the relationship. (*Id.* ¶ 66). Subsequently, at the

regularly scheduled Board meeting in June 2014, Defendants Dunn and Curtin reported that the

meeting with BOCES was productive and that the two organizations were attempting to resolve

their differences. (*Id.* ¶ 67). According to Defendants, "[i]mmediately following this

presentation, the Plaintiff publicly denounced BOCES for an unrelated issue concerning student

testing," and "Board members were annoyed that Plaintiff's unnecessary report seemed to undermine the Board's attempts to work with BOCES." (*Id.*). Plaintiff "recall[s] mentioning the APPR scoring errors, but certainly not in an effort to hurt relations with [BOCES]." (Dkt. No. 23-1, ¶ 169). As Plaintiff explains, the scoring errors affected "many teachers" individually, and Plaintiff "chose to address the matter in public session to assure the teachers that we were taking steps to remedy the problem so [the teachers'] evaluations would not reflect inaccurate information." (*Id.*).[9]

Plaintiff recalls that, later during that meeting, Defendant Taylor suggested that Plaintiff attend a BOCES meeting relating to OPEB.[10] (Dkt. No. 23-1, ¶ 170). Plaintiff's response was "We'll see." (Dkt. No. 16-83, ¶ 70; Dkt. No. 23-1, ¶ 170). Whereas Defendants claim that "Board Members felt that Plaintiff's attitude was disrespectful and unprofessional," Plaintiff explains that her response "had to do with the simple fact that this was going to be a very contentious meeting" and, having just found out that she was pregnant, she "was worried about the stress given [her] history of miscarriages." (Dkt. No. 23-1, ¶ 170). Further, Plaintiff maintains that the Board never informed her about their "outrage" at her response. (*Id.* ¶ 172).

In her 2013–2014 annual review, issued on July 10, 2014, Plaintiff received positive comments in various areas, including academics and education policy. (Dkt. No. 16-24, at 6–8). Plaintiff asserts that, when she met with Dr. Harrison to go over the review, he told her that the Board was very pleased with her performance and that she should "stay the course as [she] was doing a great job." (Dkt. No. 23-1, ¶ 6). In the review, however, some Board members noted that

---

[9] Further, Plaintiff disputes her responsibility in undermining the "reset" in the relationship with BOCES, citing pointed emails between Defendant Harrison and Dr. Baldwin over the issue of OPEB a month later, at the end of July 2014. (Dkt. No. 23-1, ¶¶ 165–168).

[10] By contrast, Defendants contend that Defendant Taylor "directed" that Plaintiff attend "BOCES' meetings again." (Dkt. No. 16-83, ¶ 70).

she needed to improve her leadership skills, reduce negative relationships and personal conflicts,
delegate more, and improve communications with staff and the Board. (Dkt. No. 16-24, at 6–9).
One member, for example, mentioned that the Board should have been informed of problems
with a preschool tenant "long before they decided not to renew their lease."[11] (Dkt. No. 16-24, at
9; *see also* Dkt. No. 16-83, ¶ 55; Dkt. No. 16-60, ¶ 23). Another member indicated that Plaintiff
provided incomplete information concerning a gasoline spill for which a staff member was
disciplined, although it later turned out that the gas pump had malfunctioned. (Dkt. No. 16-83,
¶ 56; Dkt. No. 16-24, at 9, 18, 19). Her overall score that year declined to 3.13 (from 3.18 the
previous year), and while her score increased from the 2-point range (i.e., working toward
meeting expectations) to the 3-point range (i.e., meeting expectations) in the area of staff/student
communication (from 2.68 the previous year to 3.11), she scored in the 2-point range in the areas
of human resources management (from 2.61 to 2.82), Board communication (from 3.27 to 2.67),
and values and ethics of leadership (from 3.22 to 2.76). (Dkt. No. 16-24, at 20).

> ### F.    2014–2015 School Year

In July 2014, Plaintiff told Defendant Harrison that she was pregnant; she informed the
other Board members in August 2014. (Dkt. No. 16-83, ¶ 76).

In August 2014, Plaintiff received a survey from the New York State Education
Department seeking input from component BOCES school districts concerning the direction
BOCES should take following Dr. Baldwin's retirement. (*Id.* ¶ 77). According to Plaintiff, the
survey was directed to the districts' superintendents, requested their "comments and opinions,"
and "encouraged [the superintendents] to review the survey process and these options with [the
superintendents'] Board and include their initial comments, as appropriate." (Dkt. No. 23-1,

---

[11] Plaintiff, on the other hand, asserts that the "Board was fully aware of the issues and concerns surrounding the
lease." (Dkt. No. 23-1, ¶ 214).

¶¶ 175, 176). The Board discussed the survey during an executive session in late August 2014. (Dkt. No. 23-1, ¶ 175; Dkt. No. 16-83, ¶ 78). Plaintiff indicated her preference to leave the Questar III BOCES and join the Capital District BOCES, despite a previous determination by the Board's attorneys that such option was unlikely to work out. (Dkt. No. 16-83, ¶¶ 78, 79; Dkt. No. 23-1, ¶ 179). Plaintiff states that she shared a draft response with the Board[12] and that her final draft included all written comments she received in her response letter before the letter went out.[13] (Dkt. No. 23-1, ¶ 182). Relying on the affidavit of Lynne Pampel, the Assistant Superintendent of Curriculum, Defendants claim that Plaintiff asked Dr. Pampel to review the response before she sent it and said, "Do you think this will get me fired?" (Dkt. No. 16-83, ¶ 83). Plaintiff denies ever asking Dr. Pampel about the letter or making that comment. (Dkt. No. 23-1, ¶ 210).

Among other things, Plaintiff's letter mentioned "the harassment and bullying that has occurred by BOCES employees to employees of the component schools" and "the displeasure of component schools over how [the OPEB accrual situation] was handled"; it also suggested that "consideration should be given to merging Questar III and Capital Region BOCES," and asked

---

[12] Defendants assert that Plaintiff never provided the Board with a copy of the response (whether in draft or final form) before it went out. (Dkt. No. 16-83, ¶¶ 81–82). Plaintiff avers, however, that she "shared the content of the letter (without attachments) and without the Board comments" before sending it, (Dkt. No. 23-1, ¶ 177), that "[n]ot one Board member informed [her] that they were concerned with the tone or content of [her] response," (*id.* ¶ 180), and that she "was not asked to provide a full draft to the Board before it went out," (*id.* ¶ 183). Additionally, while Defendants contend that Plaintiff's response "attached emails between Dr. Baldwin and Dr. Harrison, without Dr. Harrison's authorization, creating the impression that the Board supported the letter," (Dkt. No. 16-83, ¶ 85), Plaintiff maintains that she explained to Defendant Harrison that his emails were already posted publicly on the BOCES website, and that "he was satisfied with [her] response," (Dkt. No. 23-1, ¶ 174).

[13] In response to Defendants' contention that Plaintiff "failed to include the opinions of all the Board members who had given their opinions in email and during the August 27 Board meetings," (Dkt. No. 16-83, ¶ 85), Plaintiff states that "the opinions [expressed at the meeting] were not crystal clear," and explains that she did not include Defendant Dunn's written comments because she received them after the package went out, (Dkt. No. 23-1, ¶ 182). According to the documentary evidence, Defendant Dunn sent his written comment on August 28, 2014 at 4:38 PM, (Dkt. No. 16-25, at 1), and Plaintiff's letter responding to the survey is dated August 28, 2014, (Dkt. No. 16-26, at 1). Plaintiff wrote to Defendant Harrison on August 29, 2014 stating, "I will mail out my response to the Assistant Commissioner and I am sure that some of the BOE members may not be thrilled with it." (Dkt. No. 16-28, at 1). The parties disagree whether a majority of the Board expressed their opposition to Plaintiff's approach before the letter went out. (*Compare* Dkt. No. 16-83, ¶ 80, *with* Dkt. No. 23-1, ¶ 184).

that the District be allowed to join Capital Region BOCES, "where the rest of the Suburban Council Schools are members," noting that the District had "very little in common with the component schools in Questar III BOCES." (Dkt. No. 16-26, at 1–2). The letter also included the comments of Defendants Maciol, Garrigan-Piela, Mann, and Buono. (*Id.* at 3–4). Defendants claim that the "letter embarrassed and offended many of the Board members," and the "Board felt that her response was unprofessional and unauthorized and served to widen, rather than bridge, the gap that already existed between the District and BOCES." (Dkt. No. 16-83, ¶¶ 86, 88). Plaintiff maintains that her letter was "not aggressive, but factual and professional." (Dkt. No. 23-1, ¶ 186). The other superintendents in Questar III BOCES responded collectively on October 30, 2014, noting that, as members "who attend monthly meetings," they "felt the need to share a different perspective." (Dkt. No. 16-35, at 1 (stating that Questar III BOCES' diverse rural, suburban, and urban makeup "enrich[es] our understanding of the financial and instructional issues facing us")).

Defendants contend that Plaintiff miscommunicated with Board members in August and September 2014 concerning an objection by building principals to the completion of local education plans. (Dkt. No. 16-83, ¶ 89). Defendant Harrison asked that only the officers of the administrators' union attend an upcoming executive session of the Board, but all principals showed up. (*Id.*). Defendants blame Plaintiff for the mix-up, which Plaintiff disclaims. (Dkt. No. 23-1, ¶ 189).

Although Defendants assert that no Board members treated Plaintiff in a demeaning manner or made any negative comments about her pregnancy before she left on maternity leave, and that Defendant Harrison did not avoid Plaintiff or unduly cancel meetings, (Dkt. No. 16-83, ¶¶ 90, 91, 93), Plaintiff has a different recollection. She "noticed several changes in the manner

[she] was treated" by the Board "[a]lmost immediately after announcing her pregnancy." (Dkt. No. 23-1, ¶ 8). Defendant Harrison no longer met with her for lunch or on his way to lunch, stopped by her office when he was in the building, or made lunch plans. (*Id.* ¶ 9). According to Plaintiff, he also canceled "without explanation" the STEM roundtable group meetings for which Plaintiff "had done much work to prepare." (*Id.* ¶¶ 159–161). Other Board members also stopped calling or visiting her. (*Id.* ¶ 10). At Board meetings, "conversation was limited to strictly Board business without the casual conversation" of yore. (*Id.*). Plaintiff noticed that Board members would avoid eye contact and stop talking when she was around. (*Id.* ¶¶ 11–12). Additionally, Plaintiff states that several female Board members "made comments that show they were concerned about [her] pregnancy and whether [she] would be dedicated to [her] position after [she] gave birth." (*Id.*). According to Plaintiff, Defendant Taylor asked whether it would not "be awfully hard" for Plaintiff to return to work with young kids at home, and Defendants Curtin and Curran on a few occasions similarly "inquired about [her] plans for childcare and expressed concern over the long hours [she] would have to work with three young kids." (*Id.* ¶¶ 13–14).

In September 2014, Plaintiff approached Defendant Harrison about a contract extension, and the Board met to consider the request on October 22, 2014.[14] (Dkt. No. 16-83, ¶ 94). At the Board meeting, Defendant Garrigan-Piela congratulated Plaintiff on her pregnancy. (*Id.* ¶ 92). A majority of Board members expressed concern about Plaintiff's leadership style and communication problems, and raised the BOCES issue.[15] (Dkt. No. 16-83, ¶ 95). The Board voted 6 to 3 against extending her contract. (*Id.*).

---

[14] Per Defendants, at the time, the Board was not seeking applicants for a superintendent. (Dkt. No. 16-83, ¶ 96).

[15] Plaintiff failed to respond to Defendants' summary of the meeting, (*see* Dkt. No. 22, ¶ 95), which, in any event, is supported by the record, (*see* Dkt. No. 16-83, ¶ 95).

Plaintiff states that she had many complications during her pregnancy and that she was hospitalized a number of times partly because of concerns with the health of her twins. (Dkt. No. 23-1, ¶ 15). She went on maternity leave on December 2, 2014. (*Id.* ¶ 17). During her maternity leave, Plaintiff received her full salary.[16] (Dkt. No. 16-83, ¶ 103).

In December 2014, Sean Crall, the president of the teachers' union, asked Lawrence Edson, who was acting superintendent while Plaintiff was on leave, for a personal leave of absence on behalf of a teacher, Laura Lyons, who needed to care for her young child.[17] (Dkt. No. 16-83, ¶ 99). Plaintiff does not specifically deny that "Mr. Edson called Plaintiff who told him to deny the request," (*id.* ¶ 99), but she maintains that she "was on a medical leave at the time this occurred" and that "it was Mr. Edson who rejected the maternity leave request, not [her]," (Dkt. No. 23-1, ¶ 205). Mr. Crall emailed and called Plaintiff, who told him that there was "no contractual provision to allow two separate maternity leaves for one child." (Dkt. No. 23-1, ¶ 204). According to Defendants, Plaintiff also told Mr. Crall that the Board denied the request because it was untimely. (Dkt. No 16-83, ¶ 100). Plaintiff denies making that statement; instead, Plaintiff contends that she told Mr. Crall that the Board would need to approve a memorandum of understanding before granting the request. (Dkt. No. 23-1, ¶ 205). The Board ultimately granted Ms. Lyons' leave request.[18]

Plaintiff prematurely gave birth to twins on January 6, 2015, and the two infants were placed in the neonatal intensive care unit for almost a month. (*Id.* ¶¶ 18–19). Defendant Garrigan-Piela congratulated Plaintiff on the birth of her twins at a Board meeting in January 2015, and Defendants Garrigan-Piela and Curran sent congratulatory notes to Plaintiff while she

---

[16] Her salary and benefits did not change throughout the remainder of her contract. (Dkt. No 16-83, ¶ 103).

[17] Plaintiff does not specifically deny any of these facts. (*See* Dkt. No. 23-1, ¶¶ 203–206).

[18] Plaintiff does not specifically deny that fact. (*See* Dkt. No. 23-1, ¶¶ 203–206).

was on maternity leave. (Dkt. No 16-83, ¶ 102). However, Plaintiff states that Board members did not call to congratulate her and did not send flowers, which she contends was atypical behavior. (Dkt. No. 23-1, ¶ 20).

Plaintiff returned from maternity leave on March 16, 2015. (*Id.* ¶ 23). Plaintiff asserts that she "continued to notice a change in behavior by members of the Board" and that some members "seemed surprised that [she] had come back to work." (*Id.* ¶ 25). She describes a pattern of avoidance. (*Id.* ¶¶ 26–30).

According to Defendants, the Board discussed Plaintiff's request for a contract extension again in March 2015 "to find out whether any member's position had changed." (Dkt. No 16-83, ¶ 106). This time, the Board voted 9 to 0 against renewing Plaintiff's contract—a development Defendants appear to attribute to intervening events, including the aforementioned October 2014 collective response from superintendents regarding BOCES, as well as the events surrounding Ms. Lyons' leave request. (*Id.*). Defendants assert that they then approached Plaintiff through the intermediary of counsel to express interest "in pursuing an amicable parting . . . with regard to the last year on her contract," not to "demand Plaintiff's resignation" but to seek "a possible settlement." (*Id.* ¶ 107). Plaintiff states that the proposal was "a financial payout in exchange for [her] leaving before the end of [her] term," which she refers to as a "buy-out." (Dkt. No. 23-1, ¶ 34). Plaintiff made a settlement offer on April 24, 2015. (*Id.* ¶ 38). According to Plaintiff, over the next "several weeks," Defendants did not counter her offer, but there were rumors—which she first heard in December 2014, and which she attributes to Defendants—that Plaintiff would not return the following school year. (*Id.* ¶¶ 39, 41).

Approximately three weeks after making her settlement offer, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission (the "EEOC") in May 2015.[19] (Dkt. No. 23-1, ¶ 40; Dkt. No. 16-83, ¶ 108). Around the same time, Plaintiff issued a press release "to inform the public about [her] claim of discrimination." (Dkt. No. 23-1, ¶ 41; Dkt. No. 16-83, ¶ 108). Defendants assert that Plaintiff "met with a team of administrators and told them that they should support her in her action against the District because she could make life difficult for them if they did not." (Dkt. No. 16-83, ¶ 109). Plaintiff denies this assertion and maintains it is a "fabrication." (Dkt. No. 23-1, ¶ 216).

### G.    2015–2016 School Year

In August 2015, Plaintiff sent a letter to the District community expressing her "dismay" at leaving the district. (Dkt. No. 16-83, ¶ 110). In September 2015, Plaintiff gave a PowerPoint presentation at her annual welcome-back meeting, saying, "[I]f you want to make enemies, try changing something." (*Id.* ¶ 111). Plaintiff explains that "[t]his was not a shot at the Board, and, in the context of my speech it was clear that I was discussing and reflecting on my career and mentioned that several of the initiatives that were the most successful were met with opposition at first because change is difficult in a school system." (Dkt. No. 23-1, ¶ 207). Defendants assert that the Board viewed these comments differently and felt it was an attempt to denigrate the Board in front of the staff and faculty. (Dkt. No. 16-83, ¶ 112).

Defendants maintain that Plaintiff's problems with administrators continued in the 2015–2016 school year. In September 2015, Plaintiff asked Dr. Pampel, the Assistant Superintendent for Curriculum, to be copied on all of Dr. Pampel's correspondence with staff and building principals. (*Id.* ¶ 113; Dkt. No. 16-80). At the time, Dr. Pampel was in the hospital recovering

---

[19] The EEOC determined that it was "unable to conclude that the information obtained establishes violations of the statutes" and issued a right-to-sue-letter to Plaintiff on November 24, 2015. (Dkt. No. 16-2). Plaintiff commenced this action within 90 days of receiving that letter. (*See* Dkt. No. 1).

from surgery. (Dkt. No. 16-83, ¶ 113; Dkt. No. 16-80). According to Defendants, when Dr. Pampel returned to school, Plaintiff was no longer supportive of her efforts in the District. (Dkt. No. 16-83, ¶ 115). Plaintiff denies being "cold or antagonistic," and explains that Dr. Pampel had commented that Plaintiff would "be handled" and that Plaintiff interpreted this "as a threat that she could get the Board to retaliate" against her. (Dkt. No. 23-1, ¶ 209). Plaintiff, however, does not specifically deny that, during renovations, she placed Dr. Pampel at a small desk in the technology department apart from other administrators. (Dkt. No. 16-83, ¶ 115).

Additionally, Defendants contend that Plaintiff's relationship and communications with the Board did not improve during that time. (*Id.* ¶ 124). They state that Plaintiff did not inform the Board about certain events to which the Board was invited and did not provide the Board with information about who was covering administrative duties and committee meetings when administrators were on leave; Plaintiff denies these assertions. (*Id.* ¶¶ 118–119, 123–124; Dkt. No. 23-1, ¶¶ 111, 197, 211). On November 13, 2015, the Board sent Plaintiff a memorandum setting forth its expectations for the remainder of the year. (Dkt. No. 16-51; Dkt. No. 16-83, ¶ 120). Plaintiff interpreted the memorandum as "direct[ing] [her] to cease any communication with the school community unless it was approved or edited" by the Board, and she thought the Board "wanted [her] to become invisible"—as a result, she felt "humiliated." (Dkt. No. 23-1, ¶ 200).

In January 2016, the Board denied Plaintiff's request to speak at a press conference being held by local politicians to discuss certain educational initiatives. (Dkt. No. 16-52; Dkt. No. 16-83, ¶ 120). Defendant Harrison's email denying the request stated that the Board was "not comfortable with the nature of this press conference" and was "concerned with potential negative ramifications from Governor Cuomo by being the only school district represented at this event."

(Dkt. No. 16-52, at 1). Instead, the Board opined that "it would seem appropriate to invite a representative from [a state agency] and not from an individual school district." (*Id.*). Plaintiff claims that she had "previously been allowed in all prior years of employment" to "advocate for public education by speaking at events," and that being prevented from speaking at events "limited [her] exposure and served to further hinder her job search." (Dkt. No. 23-1, ¶ 199).

Around the time that Plaintiff's contract expired on June 30, 2016, (*id.* ¶ 51), an issue arose concerning the payout of her unused vacations days, (Dkt. No. 16-83, ¶ 125). Mr. Edson and the District's counsel—with no involvement from the Board—calculated that Plaintiff's contract only allowed her to be paid for 10 of the 32 unused vacation days listed on her paystubs and one unused vacation day for the 2015–2016 school year. (*See* Dkt. No. 16-67, ¶¶ 11–18; Dkt. No. 16-57, ¶¶ 26–32; Dkt. No. 16-83, ¶ 126; Dkt. No. 22, ¶ 126).[20] According to Mr. Edson, the contract only allowed Plaintiff to carry over 10 days each year, and the report showing 32 days included 21 days that the contract required her to use during the first year that she was a superintendent. (Dkt. No. 16-67, ¶¶ 11-14). Plaintiff was ultimately paid for 19 days of unused vacation time, according to Mr. Edson, because Plaintiff provided documentation indicating that eight sick days had mistakenly been counted as used vacation days. (*Id.* ¶ 17; Dkt. No. 16-83, ¶ 126).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and

---

[20] Plaintiff has denied this statement of material fact, which is supported by affidavits from Mr. Edson and the District's counsel, without any evidentiary support for her assertion that she is entitled to payment for the 32 days under her contract and "District policy." The Court, therefore, deems it admitted. *See* L.R. 7.1(a)(3). The record does not support Plaintiff's assertion that she was "the first employee to separate employment and be denied such payment of her benefits." (Dkt. No. 23-1, ¶ 201). Her citation to District Treasurer Linda Wager's deposition does not support her claim. (*See* Dkt. No. 23-23, at 6–7).

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome

a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact

where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

### A.    Title VII Discrimination Claim[21]

Discrimination claims under Title VII are generally evaluated under the *McDonnell*

*Douglas* burden-shifting analysis. *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92

(2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must

establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*, 509

U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's

burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119,

128 (2d Cir. 2012) (citation omitted) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S 248, 253 (1981)). The establishment of a prima facie

case creates a presumption that the employer unlawfully discriminated against the employee.

*Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate,

nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the

presumption of discrimination "drops from the picture," and the burden shifts back to the

plaintiff, who must "come forward with evidence that the defendant's proffered, non-

discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*,

224 F.3d 33, 42 (2d Cir. 2000); *see Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir.

---

[21] Plaintiff brings her Title VII discrimination claim against the District and the Board only. (Dkt. No. 1, ¶¶ 84–92).
The parties have not addressed whether Title VII applies to the Board as well as the District, and the Court does not
decide that issue.

2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### 1.    Prima Face Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)); *see also N.Y. State Office of Mental Health v. N.Y. State Div. of Human Rights*, 210 A.D.2d 686, 687 (3d Dep't 1994). The fourth prong of this test may be satisfied either by "(1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that '[she] was subjected to disparate treatment . . . [compared to persons] similarly situated in all material respects to . . . [herself].'" *Bennett*, 842 F. Supp. 2d at 497 (second alteration in original) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). There is no dispute that Plaintiff satisfies the second and third prongs. (*See* Dkt. No. 16-84, at 18 (conceding that Plaintiff was qualified for the position of superintendent, and that failure to renew a contract is an adverse employment action)). The other prongs are contested.

With regard to the first prong, Defendants argue that Plaintiff is not a member of a protected class covered by Title VII, as amended by the PDA—namely, "women affected by pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k)—because she "was no longer 'affected by pregnancy'" when she "left the employ of the District." (Dkt. No. 16-84,

at 19). That argument is meritless. The alleged adverse employment action with regard to

Plaintiff's Title VII discrimination claim is "the decision to not renew her contract," (Dkt.

No. 23, at 6–7), which the record indicates occurred in October 2014, when Plaintiff was

pregnant, and was confirmed in March 2015, shortly after Plaintiff returned from maternity

leave, (Dkt. No. 16-83, ¶¶ 95, 106). Because Plaintiff allegedly suffered an adverse employment

action during and shortly after her pregnancy, she falls within the class protected by the PDA.[22]

*Albin v. LVMH Moet Louis Vuitton, Inc.*, No. 13-cv-4356, 2014 WL 3585492, at \*4, 2014 U.S.

Dist. LEXIS 92627, at \*9 (S.D.N.Y. July 8, 2014) ("Distinguishing among previously pregnant

women to determine who is still affected by pregnancy requires selecting a temporal cutoff based

on the facts of the given case. . . . [But] a pattern has developed in this Circuit establishing a

loose line at approximately four months from the date of birth." (citations omitted)). Further, the

Court agrees with Plaintiff that she is a member of the class protected more generally by Title

VII to the extent her claims challenge discriminatory gender stereotypes regarding caregiver

responsibilities. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d

Cir. 2004) (concluding, in an equal protection case, that "stereotyping of women as caregivers

can by itself and without more be evidence of an impermissible, sex-based motive"); *Ellis v.*

*Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 277 (E.D.N.Y. 2013) (explaining, in a Title VII

case, that "[s]tereotyping of women as caregivers may, without more, be sufficient evidence of

---

[22] Defendants' reliance on *Keller v. Great Lakes Collection Bureau, Inc.*, No. 02-cv-719, 2005 WL 2406002, at \*4, 2005 U.S. Dist. LEXIS 46973, at \*4–6 (W.D.N.Y. Sept. 29, 2005), is inapposite. In that case, the adverse employment action occurred two years after the plaintiff gave birth. *See id.* Courts have denied summary judgment on pregnancy discrimination claims where the adverse employment actions occurred months after the end of the pregnancy. *See Rolon v. Pep Boys—Manny, Moe & Jack*, 601 F. Supp. 464, 468 (D. Conn. 2009) (denying summary judgment where termination occurred two months after plaintiff returned from maternity leave); *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 671, 677–78 (S.D.N.Y. 1995) (denying summary judgment where termination occurred two and a half months after plaintiff returned from maternity leave).

an impermissible, sex-based motive for an adverse employment decision to survive summary judgment").

The fourth prong "is a flexible [standard] that can be satisfied differently in differing factual scenarios." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). In pregnancy discrimination cases, it must be shown either that the plaintiff's "position remained open and was ultimately filled by a non-pregnant employee," or that "the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading'" to the adverse employment action. *Id.* (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). "Showing an employer's motivation to discriminate is 'usually' accomplished through the 'cumulative weight of circumstantial evidence.'" *United States v. City of New York*, 713 F. Supp. 2d 300, 322 (S.D.N.Y. 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

Defendants contend that Plaintiff's position was not "open" when the Board decided not to renew her contract because Plaintiff was still in that position, and further that the temporal proximity between Plaintiff's pregnancy and the Board's decision does not give rise to an inference of discrimination because that temporal proximity is not "accompanied by other circumstantial evidence" of discrimination. (Dkt. No. 16-84, at 19 n.4, 19–20). Both arguments are unconvincing. First, there is no dispute that the superintendent position was not eliminated— and therefore, remained "open"—and that a man was ultimately hired to fill that position. (*Id.* at

19 n.4). Second, and more importantly, this is not a case hinging solely on the temporal proximity between the pregnancy announcement and the adverse employment action.[23] In her affidavit, Plaintiff states that Board members' attitudes changed after she announced her pregnancy—they allegedly avoided eye contact and casual conversation, stopped calling, and canceled meetings without explanation, (Dkt. No. 23-1, ¶¶ 8–12, 159–161)—and that some Board members made comments questioning her future ability to work following her pregnancy, (*id.* ¶¶ 11–14). According to Plaintiff, Defendant Taylor, in particular, asked, "Isn't it going to be awfully hard for you to come back to work?" (*Id.* ¶ 13). Given that a plaintiff's burden to establish a prima facie case of discrimination is "not onerous," *Burdine*, 450 U.S. at 253, the Court finds that Plaintiff has mustered evidence sufficient to raise an inference of discrimination.

## 2. Nondiscriminatory Reasons for Adverse Employment Action

As Plaintiff has established a prima facie case of discrimination with respected to the Board's decision not to renew her contract, a presumption of discrimination arises, and the burden shifts to Defendants to demonstrate some legitimate, nondiscriminatory reason for the adverse decision or action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendants have satisfied that burden here. Defendants have submitted evidence that the decision not to renew was based on legitimate, nondiscriminatory reasons, including: (1) Plaintiff's persisting communication problems with the Board, (*e.g.*, Dkt. No. 16-83, ¶¶ 55, 56, 72, 74, 89); (2) Plaintiff's human resource management problems and difficult relationships with staff and administrators, (*e.g.*, *id.* ¶¶ 42, 47, 53–54, 72, 74); and (3) Plaintiff's opposition to Board directives, (*e.g.*, *id.* ¶¶ 70, 85, 88). (*See* Dkt. No. 16-

---

[23] Further, temporal proximity may be sufficient to draw an inference of discrimination for purposes of establishing a prima facie case, even if it might not be sufficient to demonstrate pretext. *See Simpson v. N.Y. State Dep't of Civil Servs.*, 166 Fed. App'x 499, 502 (2d Cir. 2006).

84, at 21). Therefore, the burden shifts back to Plaintiff to establish that these reasons were a pretext for discrimination. *Weinstock*, 224 F.3d at 42.

### 3.    Pretext

A plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]."[24] *Weinstock*, 224 F.3d at 42 (alterations in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on [her gender]."[25] *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). "[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate"

---

[24] By "false" reasons, courts mean "reasons manufactured to avoid liability." *Harding v. Wachovia Capital Markets, LLC*, 541 F. App'x 9, 12 (2d Cir. 2013) (quoting *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)). However, it is not within the courts' purview to assess whether those reasons were well-founded or not. *See Peters v. Mount Sinai Hosp.*, No. 08-cv-7250, 2010 WL 1372686, at *9, 2010 U.S. Dist. LEXIS 32884, at *23 (S.D.N.Y. Mar. 30, 2010) ("Absent a showing that an employer's performance demands were made in bad faith, an employer who has been sued on allegations of discrimination is not required to submit the reasonableness of its employment criteria to the assessment of either judge or jury."); *Crespo Vargas v. U.S. Gov't*, 573 F. Supp. 2d 532, 558 (D.P.R. 2008) ("Whether mistaken or well-founded, good-faith, non-discriminatory, non-pretextual reasons for her discharge have been presented to show that the defendant did not violate the provisions of Title VII . . . .").

[25] For purposes of Plaintiff's discrimination claim, "but-for causation is not the test." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523 (2013). "It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.*

nondiscriminatory reasons for its action. *Id.* at 846. Further, "[w]hile departures from regular procedures 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision,' summary judgment is appropriate where 'whatever irregularities existed' were either unrelated to discrimination or 'did not affect the final [adverse] decision.'" *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (quoting *Weinstock*, 224 F.3d at 41, 45).

Plaintiff's evidence of pretext is slim. Plaintiff argues that her annual evaluations contained "numerous examples of positive comments" in the same areas where Defendants claim she was deficient. (Dkt. No. 23, at 11). She terms these comments "contradictions," and she contends that, based on these positive comments, "a jury certainly can doubt and disregard defendants' claim of underperformance." (*Id.*). But the issue is whether the District's reasons for deciding not to extend her contract are pretextual, and Plaintiff has failed to identify any contradiction or inconsistency in the District's rationale for its decision. Plaintiff argues that the record shows that she "was excelling as Superintendent" and "was outperforming in her role," (Dkt. No. 23, at 19). But an employee's disagreement with an employer's evaluation "does not prove pretext." *Shabat v. Billotti*, No. 96-7638, 1997 WL 138836, at *2, 1997 U.S. App. LEXIS 5133, at *5 (2d Cir. Mar. 18, 1997) (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991)); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (stating that "plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim"), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).

Plaintiff argues that there were procedural irregularities because the Board failed to comply with its obligation to promptly and discretely refer any and all criticisms and complaints to her. She claims that "the District never called a meeting to discuss the various concerns it

supposedly harbored regarding insubordination and/or poor performance," and that "the District never formally counseled or documented their concerns until [Plaintiff] announced her pregnancy." (Dkt. No. 23, at 21). Plaintiff adds that she was never "brought . . . up on charges of insubordination or poor performance." (Dkt. No. 23, at 21). Plaintiff, however, cites no evidence indicating that a meeting, formal counseling, or charges concerning behavior or performance were required before the Board could decide not to renew her contract.[26] Since Plaintiff's performance and conduct were discussed during her annual reviews and at Board meetings, it is not clear that there was any procedural irregularity that would support an inference of discrimination. (*See* Dkt. No. 16-83, ¶¶ 51–52, 69–70; Dkt. No. 16-24, at 19).

In any event, Plaintiff has also pointed to other evidence to establish pretext: (1) the statement by the Board's attorney in May 2014 that the Board was not ready to vote on her contract renewal for "reasons not pertaining to [Plaintiff] in any fashion or to her performance," (Dkt. No. 23-7, at 1), coupled with Defendant Harrison's statement "around the same time that there was nothing to worry about, that there was [sic] no problems with [her] performance," (Dkt. No. 23-1, ¶ 46); (2) the "change in attitude" by some Board members that Plaintiff observed after she announced her pregnancy, (Dkt. No. 23-1, ¶¶ 8–12); and (3) the comments that several Board members made about her pregnancy,[27] (Dkt. No. 23-1, ¶¶ 13–14). Considering

---

[26] Plaintiff seems to conflate nonrenewal of her contract with termination for cause and its associated procedure as provided for by her employment contract. (*See* Dkt. 23, at 21–22; Dkt. No. 16-13, ¶ 17(B), at 12–13). Yet Plaintiff does not specifically argue that the termination-for-cause procedure applies to nonrenewal of the contract.

[27] Defendants argue that these comments were only "innocuous stray remark[s]." (Dkt. No. 26, at 10). However, whether "a comment will be considered a probative statement that 'evinces an intent to discriminate [or retaliate],' rather than a 'stray remark'" depends on "who made the remark," "when the remark was made in relation to the employment decision," "the content of the remark," and "the context in which the remark was made." *St. Louis v. N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 230 (E.D.N.Y.2010) (quoting *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007)). Here, the remarks were purportedly made by some female Board members—i.e., some of the decisionmakers—apparently around the time of the Board's October 2014 decision (the timing is not precisely known). (*See* Dkt. No. 23-1, ¶¶ 13–14). Although the comments may have simply been benevolent expressions of concern, a reasonable juror could evince discriminatory intent from the apparent gender stereotyping regarding childrearing. (*See id.*).

all of the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has

raised a triable issue of fact that Defendants' professed reasons for not renewing her contract

were pretextual and that the decision not to renew was motivated at least partly by pregnancy

discrimination. Given the temporal proximity between Plaintiff's August 2014 pregnancy

announcement and the Board's October 2014 decision not to renew her contract, a reasonable

jury could: conclude that the May 2014 statements contradict Defendants' post-August 2014

emphasis on Plaintiff's performance issues; credit Plaintiff's perception of a change in attitude

by Board members attributable to her pregnancy announcement; and construe Board members'

comments about her pregnancy—especially Defendant Taylor's question whether it would not

"be awfully hard for [Plaintiff] to come back to work" after her pregnancy—as evidence of

pregnancy discrimination. Accordingly, Plaintiff's Title VII claim may proceed to trial.

### B.    Equal Protection Discrimination Claim

Defendants move to dismiss Plaintiff's equal protection claim, which she brings under

§ 1983[28] against all Defendants, (*see* Dkt. No. 1, ¶¶ 93–103), on the same ground that Plaintiff's

Title VII should be dismissed, (*see* Dkt. No. 16-84, at 25–26). Defendants are correct that a

violation of the Equal Protection Clause of the U.S. Constitution is analyzed in the same manner

as a violation of Title VII. (*See* Dkt. No. 16-84, at 25–26 (citing *Demoret v. Zegarelli*, 451 F.3d

---

[28] The Complaint states, under "Second Cause of Action (42 U.S.C. § 1983 against all defendants)," that Defendants have violated Plaintiff's "constitutional rights" under the "Equal Protection Clause of both the State and Federal Constitutions." (Dkt. No. 1, ¶¶ 94–98). Obviously, § 1983 provides a vehicle only to redress violations of federal, not state, law. *See* 42 U.S.C. § 1983 (providing a right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws"). Because Plaintiff's equal protection claim under the New York Constitution is duplicative of her equal protection claim under the U.S. Constitution, that state law claim must be dismissed. *See Wierzbicki v. County of Rensselaer*, No. 14-cv-950, 2015 WL 4757755, at *6, 2015 U.S. Dist. LEXIS 105748, at *16 (N.D.N.Y. Aug. 12, 2015) ("Where, as here, adequate remedies are available under § 1983, a plaintiff has 'no private right of action under the New York State Constitution.'" (quoting *G.D.S. ex rel. Slade v. Northport–E. Northport Union Free Sch. Dist.*, 915 F. Supp. 2d 268, 280 (E.D.N.Y. 2012))).

140, 149 (2d Cir. 2006)).[29] And there is no dispute that the individual Defendants are "person[s]" that acted "under the color of state law." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (stating the elements of a § 1983 cause of action). But here, the Title VII claim survives; therefore, Plaintiff's equal protection claim may likewise go forward against the individual Defendants.[30]

Nevertheless, Defendants point out that Plaintiff has "not shown that the District and Board had a policy of discrimination as is required to establish [municipal] liability under § 1983." (Dkt. No. 16-84, at 26).[31] Since Plaintiff does not respond to Defendants' argument, the Court deems Plaintiff's equal protection claim against the District and Board abandoned. *See Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

## C.    ADA Discrimination Claim[32]

Defendants move to dismiss Plaintiff's discrimination claim under the ADA on the grounds that she was not disabled (or perceived as disabled by the District) and was not discriminated on the basis of disability. (*See* Dkt. No. 16-84, at 30). Like Title VII claims, ADA discrimination claims are governed by the same *McDonnell Douglas* burden-shifting framework.

---

[29] Although a "§ 1983 action may not . . . be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII," *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004), Plaintiff's § 1983 claim differs from her Title VII claims because "a § 1983 claim, unlike a Title VII claim, can be brought against individuals," *Demoret*, 451 F.3d at 149. Thus, Plaintiff may be able to use her § 1983 claim to recover against the individual Defendants, who are not subject to liability under Title VII.

[30] While Defendants argue that "the individual defendants are not liable for gender discrimination under § 1983 because there is no evidence that the Board members intended to discriminate," (Dkt. No. 16-84, at 26), neither party has adequately briefed the issue of whether the ten individual Defendants acted with discriminatory purpose; therefore, the Court has not considered that issue.

[31] Neither party has briefed the issue of whether a board of education's vote not to renew a superintendent's contract could constitute a "policy" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); accordingly, the Court has not considered that issue.

[32] Plaintiff's ADA retaliation claim is discussed in Part IV.E *infra*.

*See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015). In order to establish a prima facie case for discrimination under the ADA, a plaintiff must establish: (1) that the defendant is subject to the ADA;[33] (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004). If an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

The ADA defines a "disability" as, inter alia, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1). "Major life activities" include "eating, sleeping, walking, standing, lifting," and other activities. § 12102(2)(A); 29 C.F.R. § 1630.2(i). The EEOC has stated that courts should determine whether an impairment "substantially limits" a "major life activity as compared to most people in the general population," without regard to "the ameliorative effects of mitigating measures" other than glasses or contact lenses. 29 C.F.R. § 1630.2(j)(ii), (vi). The term "substantially limits" should be "construed broadly in favor of expansive coverage" and the inquiry into this threshold issue "should not demand extensive analysis." *Id.* § 1630.2(j)(i), (iii). Nevertheless, "[p]regnancy does not typically constitute a disability under the ADA." *Sam-Sekur v. Whitmore Grp., Ltd.*, No. 11-cv-4938, 2012 WL 2244325, at *7, 2012 U.S. Dist. LEXIS 83586, at *23

---

[33] The ADA covers employers with 15 or more employees. 42 U.S.C. § 12111(A). Although Plaintiff brings her ADA claims against both the District and the Board, (Dkt. No. 1, ¶¶ 116–124), the parties have not addressed whether the ADA applies to the Board as well as the District. Therefore, the Court will not address that issue.

(E.D.N.Y. June 15, 2012). And generally, "complications arising from pregnancy do not qualify as disabilities under the ADA." *Id.* at *8.

Plaintiff states that "she was hospitalized as a result of her premature labor, caused by complications," and that the complications from pregnancy "affected 'major life activities'" and "her ability to work and care for herself." (Dkt. No. 23, at 6). She describes serious health issues faced by her twins and her resulting hospitalization. (*See* Dkt. No. 23-1, ¶¶ 15, 17–19). These circumstances are sufficient to raise a triable of fact as to whether Plaintiff was disabled. *See Sam-Sekur*, 2012 WL 2244325, at *7, 2012 U.S. Dist. LEXIS 83586, at *24 ("Only in extremely rare cases have courts found that conditions that arise out of pregnancy qualify as a disability. In these cases, 'it is the physiological impairment that results from complications that renders the person disabled.'" (quoting *Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000))). Further, she avers that she spoke with a number of Board members about her medical issues, (Dkt. No. 23-1, ¶¶ 15, 21), which raises an issue of fact regarding Defendants' awareness of her disability. *See Karam v. County of Rensselaer*, No. 13-cv-1018, 2016 WL 51252, at *17, 2016 U.S. Dist. LEXIS 368, at *52 (N.D.N.Y. Jan. 4, 2016) ("A discrimination claim based on a perceived disability requires a plaintiff to show that the 'employer perceived him as having a disability as defined in the ADA.'" (quoting *Thomsen v. Stantec, Inc.*, 483 Fed. App'x 620, 622 (2d Cir. 2012))).

Nevertheless, Plaintiff has failed to establish a prima case of disability discrimination. She has adduced no evidence to satisfy the fourth prong of the prima facie case: the record is entirely devoid of any indication that the Board's decision not to renew her contract was tied to her disability, the complications she faced during her pregnancy, or her children's medical

issues. The Board first voted not to renew her contract in October 2014, before her disability. Accordingly, Plaintiff's ADA discrimination claim fails as a matter of law.

### D.    FMLA Interference Claim

Defendants move to dismiss Plaintiff's FMLA interference claim because "Plaintiff received all the leave to which she was entitled." (Dkt. No. 16-84, at 30). Plaintiff does not respond to that argument. Under the FMLA, an eligible employee may take up to 12 workweeks of unpaid leave each year in order to care for his or her newborn child. *See* 29 U.S.C. § 2612(a)(1)(A). Upon returning from leave, the employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." § 2614(a)(1). The FMLA "creates a private right of action to seek both equitable relief and money damages 'against any employer (including a public agency) . . .,' § 2617(a)(2), should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights, § 2615(a)(1)." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003).

To establish a claim that an employer denied or interfered with substantive rights under the FMLA,[34] a plaintiff must prove that: (1) she is an eligible employee under the FMLA; (2) the defendant is an employer as defined in the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of his intention to take leave; and (5) she was denied FMLA benefits. *See Smith v. Westchester County*, 769 F. Supp. 2d 448, 464–65 (S.D.N.Y. 2011). As there is no dispute that Plaintiff received all her FMLA benefits, (Dkt. No. 16-83, ¶ 103; Dkt No. 22, ¶ 103), Plaintiff cannot establish the fifth element of her FMLA interference claims. Therefore, her FMLA interference claim fails as a matter of law.

---

[34] In addition to bringing an FMLA claim under an interference theory, an employee may bring an FMLA claim under a retaliation theory. *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004). Plaintiff's FMLA retaliation claim is discussed in Part IV.E *infra*.

### E.    Retaliation Claims Under Title VII, Equal Protection Clause, Title IX, ADA, and FMLA

Plaintiff's retaliation claims under Title VII (including the PDA), the Equal Protection Clause, Title IX, the ADA, and the FMLA must be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015) (Title VII and Equal Protection Clause retaliation); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (Title IX retaliation); *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) (ADA retaliation); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012) (Title VII retaliation); *Bennett*, 842 F. Supp. 2d at 499 (Title VII retaliation); *Bond v. Sterling, Inc.*, 77 F. Supp. 2d 300, 303 (N.D.N.Y. 1999) (FMLA retaliation). Plaintiff must first establish a prima facie case of retaliation. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Id.* at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive.[35] *Nassar*, 133 S. Ct. at 2534. The four prongs of a prima facie case of retaliation are that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125.

---

[35] The standard applicable to Title VII, equal protection, and Title IX retaliation claims is "but-for" causation. *Nassar*, 133 S. Ct. at 2534 (but-for causation required for Title VII retaliation claims); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) ("As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII."). It remains unsettled in the Second Circuit whether the standard for Title IX and ADA retaliation claims is "but-for" or "motivating factor" causation. *See Holcomb v. State Univ. of N.Y.*, 698 F. App'x 30, 31 (2d Cir. 2017) (Title IX retaliation); *Eisner v. Cardozo*, 684 Fed. App'x 29, 30 (2d Cir. 2017) (ADA retaliation). FMLA retaliation claims only require "negative factor" causation. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 169 (2d Cir. 2017).

The definition of "adverse employment action" in the retaliation context is "not limited to discrimination actions that affect the terms and conditions of employment," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), but rather covers harms that might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012). The requirement that the employer's action be materially adverse is meant to separate significant from trivial harms. *White*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). The perspective is that of a reasonable employee because the harm must be assessed objectively. *Id.*

Plaintiff contends that Defendants retaliated against her by taking the following actions after she took "protected medical leave" and after "she filed with the EEOC": (a) "dissemination of false statements regarding her performance"; (b) "issuance of a counseling memorandum"; (c) "excessive scrutiny of her work"; (d) "refusing to pay her vacation pay upon separation terms"; and (e) "changes in her duties," including the requirement that she "submit all work to the Board before dissemination" and the Board's refusal to "allow her to perform tasks she used to perform, including public advocacy for education." (Dkt. No. 23, at 24). In moving for summary judgment on those claims, Defendants argue that "Plaintiff's allegations do not describe materially adverse working conditions" and therefore cannot make out retaliation claims. (Dkt. No. 16-84, at 27). Defendants also argue that they have articulated legitimate, nonretaliatory reasons and that Plaintiff has failed to raise a triable issue of fact on pretext. The Court agrees. While Plaintiff has

raised a triable issue of fact with respect to certain of the alleged adverse actions, she has failed to adduce evidence from which a reasonable jury could find the legitimate, nonretaliatory reasons proffered by Defendants for those actions were pretextual.[36]

### 1.    Prima Facie Case

#### a.    Dissemination of False Statements

The Court reviewed Plaintiff's declaration and found no support for her claim that the Board disseminated "false statements regarding her performance." (Dkt. No. 23, at 24).

#### b.    Counseling Memorandum

Nor is there any record of a "counseling memorandum." There is a November 13, 2015 memorandum that the Board sent her regarding "Transition Expectations," (Dkt. No. 16-51) (the "Transition Memorandum"), which required that Plaintiff preclear with the Board certain communications prior to distribution.[37] That requirement is discussed below.

#### c.    Excessive Scrutiny

Plaintiff claims that she was subjected to "excessive scrutiny" following her EEOC complaint. (Dkt. No. 23, at 24). She states that, in 2014–2015, Board members "did not attend a single community budget meeting but, a year later, "the Board took a very active interest at being at every event [she] attended," and that she felt that she was being "watched and stalked." (Dkt.

---

[36] The Court notes that Plaintiff, in her opposition memorandum, does not support her retaliation claims with citations to the record. (*See* Dkt. No. 23, at 24).

[37] Additionally, the Transition Memorandum "outline[d] the Board's expectations for [Plaintiff] as [she] proceed[ed] through [her] final year of employment," and expressed the hope "that potential misunderstandings regarding [her] continuing services and the manner in which [she] carr[ied] them out [could] be avoided." (Dkt. No. 16-51, at 1). It requested that Board meeting agendas "be developed with the Board leadership in advance of the meetings," that the Board receive timely responses and follow-up to Board requests, that the Board be "informed and [kept] up-to-date on business that [was] important to the present or future operations of the District," that "[c]ommunications and comments to staff . . . be appropriate, professional and pertinent to the work of the District," that the Board be timely informed "in advance of any plans for forms of District recognition," that "presentations, discussions and/or correspondence [Plaintiff] ma[de] to District stakeholders . . . be professional," and that Plaintiff "communicate [her] absences or time taken from work . . . so [the Board was] aware and [knew] who [was] covering the District." (Dkt. No. 16-51, at 1–6).

No. 23-1, ¶ 198). "[A]n employer's excessive scrutiny of an employee, without more, fails to

satisfy the requirements for an adverse employment action." *Dotson v. City of Syracuse*, No. 04-

cv-1388, 2009 WL 2176127, at *18, 2009 U.S. Dist. LEXIS 62174, at *52 (N.D.N.Y. July 21,

2009). Absent evidence of any adverse consequences from such scrutiny, this does not rise to the

level of an adverse action. *Ward v. Shaddock*, No. 14-cv-7660, 2016 WL 4371752, at *12 n.14,

2016 U.S. Dist. LEXIS 106438, at *41 n.14 (S.D.N.Y. Aug. 11, 2016).

### d.    Vacation Day Payout

Plaintiff claims that Defendants retaliated by "refusing to pay" out her accrued vacation

days when her employment with the District expired. (Dkt. No. 23, at 24). As set forth above,

however, she has failed to raise a triable issue of fact regarding that assertion. (*See supra* note

20). Defendants paid out all the accrued days to which Plaintiff was eligible under her contract,

even adding eight days that Plaintiff claimed were sick days that had been miscounted as used

vacation days. (*See* Dkt. No. 16-67, ¶ 11; Dkt No. 16-83, ¶ 126).

### e.    Changes in Duties

Plaintiff also claims that her duties changed after her maternity leave and EEOC filing.

(*See* Dkt. No. 23, at 24; Dkt. No. 23-1, ¶¶ 193–196). She was no longer "included in the process

of developing and creating Board goals through a collaborative process with the Board," (Dkt.

No. 23-1, ¶ 193), invited to executive meetings between the Board and staff or union leadership,

(*id.* ¶ 194), or invited to the Board's 2015 retreat, (*id.* ¶¶ 195–196). Further, Plaintiff interpreted

the November 2015 Transition Memorandum as a directive "to cease any communication with

the school community unless it was approved or edited by" the Board. (*Id.* ¶ 200).[38]

---

[38] In the Transition Memorandum, the Board requested predistribution review by the Board of "[f]uture
correspondence of a public relations nature on future matters that [Plaintiff] plan[ned] to send District-wide to
stakeholders (i.e. Welcome Back letter)." (Dkt. No. 16-51, at 4).

Additionally, Plaintiff points to the Board's denial of Plaintiff's request to speak at a press conference organized by state legislators in January 2016. (Dkt. No. 23-1, ¶ 199).

Whether a reassignment of job duties "is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (quoting *White*, 548 U.S. at 71). Plaintiff contends that nonparticipation in Board meetings and processes "made it very difficult for [her] to perform [her] job," that it was "a major change to [her] duties," and that "it is unheard of for a school district board to develop annual goals without the input of the Superintendent." (Dkt. No. 23-1, ¶¶ 193–194, *see also id.* ¶ 196). According to Plaintiff, the directive requiring preapproval of certain communications "had never happened in [her] career," and she felt "humiliated" and "had difficulty attending meetings with other superintendents as a result of the shame [she] felt." (*Id.* ¶ 200). As for the Board's denial of her public speaking request, Plaintiff stated that it was the first time she was "denied the opportunity to advocate for public education by speaking at events even though [she] had previously been allowed in all prior years of employment," and that the denial "limited [her] exposure and served to further hinder her job search." (*Id.* ¶ 199). Considering the evidence in the light most favorable to Plaintiff, the Court finds that there is a material issue of fact as to whether the changes in her job responsibilities constituted an adverse action.

### 2.     Nonretaliatory Reasons for Adverse Employment Action

Given that Plaintiff has raised a triable issue of fact as to whether the job changes she describes were materially adverse, the next step in the analysis is to assess the reasons advanced by Defendants to justify those changes. With regard to Plaintiff's exclusion from Board processes, Defendant Harrison denies that, "after she filed the EEOC complaint, the Board began

to exclude her from its activities." (Dkt. No. 16-12, ¶ 88). In particular, while Defendant

Harrison acknowledges that Plaintiff and assistant superintendents attended the Board's retreats

in previous years, he explains that, with regard to the 2015 retreat, only Board members

attended, with no administrative staff, because the Board "wanted to be certain that it handled

communications appropriately with [Plaintiff]" following the filing of her EEOC complaint.

(*Id.*).

      With regard to the requirement in the Transition Memorandum that Plaintiff share certain

communications with the Board before distribution, Defendants explain that the requirement was

prompted by Plaintiff's negative comments toward the Board. (Dkt. No. 26, at 11). Defendant

Harrison explained that, in August 2015, Plaintiff sent a "welcome back" letter to the school

community, which stated: "[I]t is with great dismay that my tenure with [the District] is ending."

(Dkt. No. 16-12, ¶ 89; Dkt. No. 16-47). Defendant Harrison "felt that this language was

unprofessional and was meant to paint the Board in an unflattering light." (Dkt. No. 16-12, ¶ 89).

The following month, at the annual staff assembly before the beginning of the school year,

Plaintiff purportedly "prepared a power point which included a slide" that stated: "[I]f you want

to make enemies, try changing something." (*Id.* ¶ 90). According to Defendant Harrison, "Board

members felt that this was a shot at the Board," and he felt that "this was deliberate attempt by

[Plaintiff] to paint the Board in an unflattering light." (*Id.*).

      Lastly, with regard to the Board's denial of Plaintiff's request to participate in the

January 2016 press conference, Defendants attached a contemporaneous email that explained the

Board's rationale. (*See* Dkt. No. 16-52). Per the Board's January 5, 2016 email to Plaintiff, the

Board was "not comfortable with the nature of this press conference" and was "concerned with

potential negative ramifications from Governor Cuomo by being the only school district

represented at this event." (*Id.* at 1). Defendant Harrison explained in his affidavit that the "press conference was to be held at a time when Governor Andrew Cuomo was preparing his proposed budget for the legislature," and the state legislators organizing the press conference had "all been critical of the Cuomo administration in the past." (Dkt. No. 16-12, ¶ 96). Since "the District was attempting to have its Gap Elimination Adjustment restored in Governor Cuomo's budget," "the Board felt that having a representative speak at this conference may be counterproductive to these attempts." (*Id.* ¶ 96 (footnote omitted)).

Having considered the above explanations, the Court finds that Defendants have met their burden to proffer legitimate, nonretaliatory reasons for the complained-of changes in duties.

### 3.    Pretext

The third step in the analysis is to determine whether Plaintiff has adduced any evidence of pretext. Plaintiff, however, has failed to show how Defendants' legitimate, nonretaliatory reasons for the changes in job duties are pretextual. Instead, she contends that her pretext arguments concerning the discrimination claims "are equally applicable to the retaliation claim." (Dkt. No. 23, at 24). But the pretext issue here is not the same. For her discrimination claims, Plaintiff had to proffer evidence that the real reason that Defendants did not renew her contract was pregnancy or gender discrimination, as opposed to the nondiscriminatory reasons advanced by Defendants, and she successfully raised a triable issue of fact in that regard by pointing to, among other things, a change in attitude and various comments by Board members after she announced her pregnancy. By contrast, for her retaliation claims, Plaintiff had to proffer evidence that the real reason for the complained-of actions (the changes in job duties) was her engaging in protected activity (taking medical leave and filing the EEOC complaint), as opposed to the nonretaliatory reasons advanced by Defendants. Yet she has not pointed to any evidence in

the record indicating that the changes in job duties were in retaliation for her engaging in protected activity.[39]

In sum, Plaintiff has failed to raise a triable issue of fact on her retaliation claims under Title VII, the Equal Protection Clause, the ADA, and the FMLA.

### F.    Title IX Discrimination Claim

The parties dispute whether Plaintiff may proceed with her Title IX discrimination claim in parallel with her Title VII discrimination claim. (*See* Dkt. No. 16-84, at 30–31; Dkt. No. 23, at 25–26). This question subsumes two distinct issues that have split courts of appeals outside, and district courts within, the Second Circuit: (1) whether Title IX provides a private right of action for an employee of a federally funded educational institution who alleges gender discrimination;[40] and (2) if such a private right of action exists, whether such employee must nevertheless proceed under Title VII exclusively to the extent Title VII applies to her claim.

Although Title IX does not contain an express private right of action,[41] the Supreme Court in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), applied the factors it set forth in *Cort v. Ash*, 422 U.S. 66 (1975), to determine whether "Congress intended to make a remedy

---

[39] The absence of any evidence of pretext would similarly doom the other adverse actions alleged by Plaintiff, even if the Court had found them to be materially adverse. (*See supra* Part IV.E.1.a–.d).

[40] The Second Circuit has noted that courts of appeals have split on the issue of whether the right of action under Title IX extends to employment discrimination claims, but it has not yet ruled on that issue. *See Summa*, 708 F.3d at 131 n.1 (recognizing that while the "First and Fourth Circuits," as well as the United States Department of Justice, "have recognized such a right of action," the Fifth Circuit "has held there is no such right" (citing *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205–06 (4th Cir. 1994); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897 (1st Cir. 1988); *Lakoski v. James*, 66 F.3d 751, 755 (5th Cir. 1995); U.S. Dep't of Justice, Title IX Legal Manual IV.B.2)); *Torres v. Pisano*, 116 F.3d 625, 630 n.3 (2d Cir. 1997) (same); *compare, e.g.*, *Gardner v. St. Bonaventure Univ.*, 171 F. Supp. 2d 118, 127–28 (W.D.N.Y. 2001) (no private right of action under Title IX for employees), *and Philpott v. New York*, 252 F. Supp. 3d 313, 318–19 (S.D.N.Y. 2017) (same), *with Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 10-cv-3168, 2011 WL 1404934, at *9–12, 2011 U.S. Dist. LEXIS 42055, at *27–36 (S.D.N.Y. Feb. 9, 2011) (holding that Title IX right of action applies to employment claims and is not foreclosed by Title VII remedies), *abrogated on other grounds by Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130 (2d Cir. 2015), *and Henschke v. N.Y. Hosp.–Cornell Med. Ctr.*, 821 F. Supp. 166, 171–72 (S.D.N.Y. 1993) (same).

[41] Section 901(a) of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

available to a special class of litigants." 441 U.S. at 688. The Court found that the text of the statute "expressly identifies the class Congress intended to benefit" ("persons discriminated against on the basis of sex"), that the legislative history suggested that "Congress intended to create" a private remedy, that a private right of action was "fully consistent" with the public remedy (the cutoff of funds to educational institutions), and finally that "implying a federal remedy" would not intrude on an area traditionally relegated to state law. *Id.* at 689–709. It concluded that all four *Cort* factors supported the "implication of a cause of action in favor of private victims of discrimination." *Id.* at 709.

In a subsequent case, the Supreme Court interpreted the scope of Title IX in the context of passing on the validity of regulations promulgated under its public enforcement provision. *See N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982). The Court held that Title IX protects both employees and students at federally funded educational institutions against gender discrimination. *Id.* at 530 ("The legislative history thus corroborates our reading of the statutory language and verifies the Court of Appeals' conclusion that employment discrimination comes within the prohibition of Title IX."). More than 20 years later, the scope of Title IX's implied private right of action came before the Supreme Court in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005). Writing for a majority of five justices, Justice O'Connor opined that Title IX's private right of action reached a retaliation claim brought by a gym teacher who had complained of gender discrimination against a girls' basketball team that he coached. *Id.* at 171 (holding that Title IX's implied right of action "encompasses claims of retaliation . . . where the funding recipient retaliates against an individual because he has complained about sex discrimination"). Read together, *Cannon*, *Bell*, and *Jackson* support the proposition that Title

IX's private of action encompasses gender discrimination claims brought by employees of educational institutions receiving federal funds.[42]

As to the second issue—whether Title VII is an exclusive remedy that forecloses private enforcement of Title IX by employees of federally funded educational institutions—courts have reached different conclusions based on the legislative history of the two statutes and also based on contrasting policy considerations. *Compare Gardner*, 171 F. Supp. 2d at 128 (concluding, based on the legislative history of the two statutes, that Title IX does not cover claims by employees because Title VII was amended for that purpose), *with Kohlhausen*, 2011 WL 1404934, at *11, 2011 U.S. Dist. LEXIS 42055, at *32 (reading Title IX's legislative history as placing a "heavy emphasis on employment discrimination in educational institutions"); *compare also Gardner*, 171 F. Supp. 2d at 127–28 (expressing concern that Title IX employee claims would "circumvent" Title VII's prerequisites, such as exhaustion of administrative remedies), *with Henschke*, 821 F. Supp. at 172 (noting that Congress meant Title IX to "serve as an additional protection against gender-based discrimination in educational programs receiving federal funding regardless of the availability of a remedy under Title VII").

These issues would have to be decided in an appropriate case; this lawsuit, however, is a poor vehicle for resolving them now. Here, Plaintiff's Title VII and IX claims are entirely duplicative: they are based on the same operative facts (Defendants' allegedly discriminatory

---

[42] The Court recognizes that there is another line of precedent building on *Cort v. Ash* abandoning the previous judicial practice—the "*ancient regime*"—of implying private remedies in statutes where Congress's intent to create such rights of action is absent. *Alexander v. Sandoval*, 532 U.S. 275, 287–88 (2001); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) ("Following [*Cannon*'s] expressed caution [that Congress should confer private rights of action in explicit terms], the Court clarified in a series of cases that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." (quoting *Sandoval*, 532 U.S. at 286)); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008). Further, that same line of precedent restricts the extension of implied private rights of action inherited from the *ancient regime*. *See Stoneridge*, 552 U.S. at 165.

nonrenewal of Plaintiff's employment contract), seek the same relief (money damages),[43] are reviewed under the same legal standard (the *McDonnell Douglas* framework),[44] and are subject to identical defenses.[45] In these circumstances, the Court exercises its discretion to dismiss the duplicative Title IX claim. *See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Ore., Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016) ("Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief."); *Macineirghe v. County of Suffolk*, No. 13-cv-1512, 2015 WL 4459456, at *16, 2015 U.S. Dist. LEXIS 94635, at *39 (E.D.N.Y. July 21, 2015) ("[I]t is within the Court's discretion to dismiss duplicative claims *sua sponte*."); *Bd. of Trustees of IBEW Local 43 Elec. Contractors Health & Welfare & Pension Funds v. D'Arcangelo & Co., LLP*, No. 12-cv-1251, 2012 WL 6681765, at *2, 2012 U.S. Dist. LEXIS 180855, at *4–5 (N.D.N.Y. Dec. 21, 2012) (citing *Matsumura v. Benihana Nat'l Corp.*, 465 F. App'x 23, 29 (2d Cir.2012)) ("Where, as here, separately pleaded claims are based upon the same operative facts and do not allege distinct damages, the duplicative claims should be dismissed.").

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 16) is

**GRANTED in part** and **DENIED in part** in accordance with this Memorandum-Decision and Order; and it is further

---

[43] Plaintiff argued in her opposition that punitive damages are available under Title IX. (Dkt. No. 23, at 25–26). They are not. *See Benacquista v. Spratt*, 217 F. Supp. 3d 588, 606 (N.D.N.Y. 2016).

[44] "[W]e have applied Title VII's framework and principles to Title IX claims." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016); *see also Weinstock*, 224 F.3d 33, 42 (2d Cir. 2000) ("[I]dentical standards apply to employment discrimination claims brought under Title VII [and] Title IX . . . .").

[45] Exhaustion is not at issue here because Plaintiff exhausted her administrative remedies under Title VII. (*See* Dkt. No. 1, ¶¶ 13–15; Dkt. No. 16-83, ¶¶ 6–7).

**ORDERED** that the Title VII retaliation claim against the District and the Board in the First Cause of Action, the New York Constitution equal protection discrimination and retaliation claims against all Defendants in the Second Cause of Action, the U.S. Constitution equal protection discrimination and retaliation claims against the District and the Board in the Second Cause of Action, the Title IX discrimination and retaliation claims against all Defendants (Third Cause of Action), the ADA discrimination and retaliation claims against the District and the Board (Fourth Cause of Action), and the FMLA interference and retaliation claims against all Defendants (Fifth Cause of Action) are **DISMISSED with prejudice**; and it is further

**ORDERED** that the case shall proceed to trial: against the District and the Board on the Title VII and PDA discrimination claim in the First Cause of Action; and against the individual Defendants under 42 U.S.C. § 1983 in the Second Cause of Action.

**IT IS SO ORDERED.**

Dated: February 21, 2018
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge